17-1377 USA v. Justin Jenkins 17-1465 USA v. Quintin Howell 17-1377 USA v. Quintin Howell Mr. Markku for Mr. Jenkins I wanted to focus the Court's attention on two different parts of the arguments that I've raised in my brief. First, I really wanted to focus the attention on the search at the Candlewick Apartments. While I also argue that the Edwin House search was improper and any evidences must be suppressed, I think focusing on Candlewick will cover the arguments that I think equally apply to Edwin. Ultimately, I don't think there's much question that the Candlewick affidavit lacked probable cause for search. The District Court didn't specifically rule on that, but implied that in fact there wasn't probable cause of search. Instead, found that the good faith exception allowed for the evidence to be admissible in court. I don't believe that's fair or reasonable given the facts of this case. The Court knows there are two different exceptions to the good faith exception. One of those being when an affidavit is bare bones. Another one is when the officer, it's objectively unreasonable for the officer to rely on the issuance of the affidavit. What I'd like to point the Court's attention to is we have experienced officers in this case who conducted a lengthy investigation. They detail at the beginning of the affidavit how many different criminal investigations they'd undergone, how much they've been involved in narcotics investigations. That actually, in my mind, cuts in our favor why there's not good faith in this case. These officers were very well experienced, knew when they submitted this affidavit to the magistrate that they had not identified one, not even one of the suspects in this lengthy affidavit who actually lived at the place to be searched, 1203 Candlewick. Again, despite months of investigation, they couldn't even identify one of these suspects as living there. They had no information from informants or otherwise that drugs, guns, or any other type of contraband would be located in 1203 Candlewick. Again, I think their experience and training cuts against them here. They did an extensive investigation. They had an opportunity to survey these people that were involved. They were involved in multiple controlled buys. Yet they knew when they submitted this affidavit that not one of the informants that they had said that they had observed any type of illegal contraband in 1203 Candlewick. Now, there was something in the affidavit about Mr. Hall having a key at Candlewick and parking there. Is that? There was a statement that Mr. Hall had keyed into the building. If you look at the affidavit or the search warrant, it describes this as a large three-story building with multiple units, and they said that Mr. Hall had keyed into the building at one point. No one observed Mr. Hall actually key into the particular apartment. I believe the person that they saw key into the apartment was an unidentified male that they may have observed on another occasion. But it wasn't part of any sort of controlled buy, nor did they trace that unidentified black male directly from a controlled purchase back to that location. So while Hall was seen going into the building, he was not seen going into the apartment. Also, while they did a lot of controlled buys in this case, they were not able to conduct a single controlled buy that showed a person leaving from 1203 and going to the controlled buy location, delivering drugs, and then going back to 1203. That, to me, would have been a clear tie to the place to be searched. Am I right or wrong about this? I'm relying on some notes I made because I found the facts relating to all of these various locations when you tried to retain them to be confusing. And what I have written down seems to—I don't think it conflicts, but it probably would need some amplification for me to understand fully. I have a note that Mr. Hall traveled from Candlewick to Edwin to meet Mr. Howell. And then after that, there were various parking lot exchanges that would be consistent with drug activity. Am I wrong about that or am I right about that? There was, I believe, one allegation that Hall's car was seen leaving the Candlewick apartment complex. No one said that the car that he came out of, even Building 300— But nevertheless, I mean, there is evidence that Hall drove from there to Edwin and then drove to a place with Howell where they engaged in activity that would be consistent with drug exchanges in a parking lot. It's true. It's part of the reason why I think Candlewick is the stronger of the two arguments, between Candlewick and Edwin. Because when they went to Edwin, it was after that, after Edwin, that they then went to another parking lot where the police observed activity that they thought may have been controlled substance purchases. Again, they didn't actually see substances exchange hands. What they saw was activity— Well, they saw activity consistent with the sale of drugs. That's correct. So let's go back to that fact. I mean, you know, the police aren't out there testing the substance that's being handled. When they're doing surveillance, they never are out there verifying that what they're seeing is, in fact, drugs. They're doing surveillance. They're not arresting or intervening in the transactions in any way. That's correct, but they also did a lot of controlled buys in this case, and yet they weren't able to get a single one coming from Candlewick. Secondly, on that Candlewick part, remember that they go to another residence before they then—two individuals then go and go to the place where the court described as possible drug suspicion. Well, is it inaccurate to say that with respect to Candlewick and Edwin, there were various incidents where folks were driving from one or the other to one or the other to what were believed to be drug buys? I think that it's fair to say they were driving, but the reason why the affidavit is really misleading is that all they have, most of the information on Candlewick is things that occur in the parking lot. This is an apartment complex, and they don't have anything coming out of— they don't have people coming directly out of a Building 300, and they don't have anybody coming out of the particular location. It wouldn't be observable to somebody conducting surveillance, would it? They saw all they could see, is that right? I don't know. I don't know what they saw. Well, it's an apartment complex, and the door of the apartment is not visible. Then when you see somebody using a card or a key or whatever it is to get into the building, then you're not going to see them entering the apartment, right? I'm sorry, your time is up. You can answer that real briefly, and then— That's possible, except that they were able to survey once into the building, which implies they could have done other times, and yet they never see any of these particular suspects, Hall, Howell, or Jenkins, leaving the building for any of these—I'm sorry, leaving the apartment. Not the building, because it's important. This is a multi-unit apartment complex. They don't have any of them leaving that particular apartment. That's where the Fourth Amendment protection is. Not in the building, not on the cars, in that one room. Okay, I got your point. We'll hear from you, Mr. Graham. May it please the Court, my name is Scott Graham, here on behalf of Mr. Howell. With the Court's permission, I would reserve three minutes for rebuttal. I want to dive right into what I think is the key issue for Mr. Howell. I would concede to the Court that the affidavits that were filed in this matter most likely demonstrate probable cause to believe that Mr. Howell was involved in some illegal activity, that the activity occurred outside the two residences in question. And the issue is whether or not there is a sufficient nexus between that and probable cause to believe that drugs would be found within those residences. That's getting right at the point, recognizing that now we're talking about— So the question becomes whether or not an affidavit that may well establish probable cause to show someone was involved outside the apartment, whether that affidavit demonstrates that there is reason to believe that there are drugs in the apartment. We think not. We think that the cases that have been cited both by Mr. Howell and by the government do not establish clear law for the proposition that merely because you are involved in a drug transaction, low-level, street-by, street sale, outside an apartment, that drugs will be found inside the apartment. I mean, we've got to take that on in this case. And if Mr. Howell cannot persuade the Court that there is not a sufficient nexus, then I certainly recognize that he has a problem in regard to the searches of these two apartments. The question here is—one of the questions is, did anyone ever see a sale or a controlled buy from Dory Drive or Dragonfly? That's a key, very, very crucial issue. The answer is no. Has anyone ever alleged that? The answer is no. Has anyone ever alleged that there was a quantity of drugs found on Mr. Howell or with Mr. Howell that was so large, after leaving one of these locations directly or indirectly, that you would think there would be more back in the apartment? The answer is no. So what we have is, in fact, a situation here where we have street-level business occurring, and I guess an inference then that if it happens, the stash, if you will, must be back in one of the residences. He lives at Dory Drive, correct? Correct. So don't we have this case, United States v. Williams, that suggests that it's reasonable for people to infer that—I mean, that case was about arms, but could also be about drugs, that dealers keep their drugs in their apartments? Well, the answer is yes. We have that case, but the— Oh, I'm having trouble. Yeah, the problem is, I think, in Williams, that more was observed in the apartment than was— well, nothing was ever observed here. I also think that in regard to the distinction about street-level drugs, that the items are so small that they could be stored anywhere and not necessarily in a residence. I guess that's my way to distinguish that case. I also would note that we've relied on Higgins. Now, in Higgins, the search was upheld based upon good faith, but we think that the analysis regarding probable cause applies here, and we think that case is equally strong in supporting us, as is Williams, in supporting a contrary position. And we think, of course, that good faith doesn't apply here, as opposed to Higgins, in part because that was a 2009 case. Certainly, the knowledge about the law, knowledge about what is appropriate for officers, is different in this day and age, or in 2015. We're actually talking about a search here that— just about exactly three years old in 2015 in this case, in the current case. So, we think that there is an issue here about getting right to the point, Judge Larson, that you identify. We think that there is an issue here that suggests that possession of street-level drug amounts does not lead to an inference that drugs are stored at the residence. Well, there was a lot more with respect to your client. I mean, he was a known drug dealer. He was linked to Dory Drive by his prior—giving it as his residence on the occasion of his prior arrest. He was linked by surveillance. And then the officers had a lot more information about Dory and about your client. Your Honor, I would suggest that each one of those pieces is simply inadequate to get the government where it needs to go, or the officers where they need to go. Now, again, he lived there, but that doesn't mean that a street-level amount would be stored there. There were call records that I concede were involved in this case. I don't think those call records necessarily establish— When you say call records, are you talking about the GPS tracking to that address on the phone? No, I'm talking about telephone calls. But there was GPS tracking to the Dory Drive address on the ghost phone. Sure. And again— How do you deal with that? I see the answer is yes. There were GPS. I see my time's up, and if I could just make one point. Again, knowing that there is other things showing that Mr. Howell was there, does that mean that there would be drugs there? That's the question. You'll have your rebuttal time. Thank you. Mr. Baker. Good morning. May it please the Court. Stephen Baker on behalf of the United States. The key issue for this case, as I listened to both the arguments from both defendants and in the briefing, I think for the holistic view that this Court needs to take of the magistrate's decisions for all of these probable cause search warrants with a common sense eye, is the ongoing nature of the drug trafficking here by Mr. Howell in the first part in 2014, which was later joined by Mr. Jenkins. The Court mentioned there were multiple controlled buys. There were five in 2014 and six in 2015 leading up to them. The Court noted several issues about the surveillance, and I'd like to respond to some of the focus that the defendants brought to their oral argument. Specifically with regard to Mr. Jenkins for Candlewick, and I think by and large in whole it is important that it's not only drugs that these agents are looking for and asking the magistrate court in Kalamazoo for the right to go find. It's evidence of this drug trafficking, especially in a case where you have a long-term and Defendant Jenkins conceded it was an extensive investigation. The reason the investigation was extensive is because the drug trafficking activity was ongoing. There were multiple controlled buys over two months in 2015 and from February to April of 2015 and two months in 2014 from October up through December. This activity being ongoing colors a great deal of how any judge has to look at the cause that's submitted in these warrants, and it's detailed. The Court mentioned the GPS information from Mr. Howell's phone, the ghost phone, and what's most important about this drug trafficking from these group of individuals, the phones are very important. What do they share? They don't share one location where they're dealing drugs out of a house through the keyhole or opening a door and that's where the drugs come from. Conceitedly, if that were the probable cause that we had here with one location, it would be very clear we wouldn't be arguing these issues. What these defendants were doing was working out of different locations, using multiple locations, using multiple phones, but the phones were the tie to how they shared the business, fostered their customer base, and got drugs on the street. The extensive investigation that went on here worked backwards from the phone and the surveillance for what the officers could see in order to determine what locations might be relevant and might have evidence in terms of those records, in terms of the tools of the drug trade, not just the stash, as Defendant Howell raised in terms of his oral argument. It's not just the stash of drugs that is proof of the amount of drug dealing here. There's a great deal more, and for these individuals with the ongoing activity, it's the record of their activity, and that record can also be found in those cell phones, numerous numbers of which were found as a result of these warrants. That's no way to backdoor the cause of these warrants from what is found, but that's exactly what the investigators are looking for, to pace their activity over time. They are dealing user amounts on the street, but they have larger amounts and they have ongoing activity. Specifically, the court asked Mr. Jenkins' attorney about Candlewick in terms of the tie to that, and I wanted to address some of those because there are a great deal of facts in these affidavits, each one of them from 8 to 11 pages long, much of which has to do with the experience of the officers, but a great deal of which has to do with the actual facts on the ground of their investigation. For Candlewick, the officers observed that Hall lived there and determined it, based upon their observations from February of 2015 up through April 2nd of 2015, where they determined that he left Kalamazoo and went to Benton Harbor. Now, they first observed him in the proximity of the Candlewick apartment in February on the 23rd, with true controlled purchases where Mr. Hall was going back to the building. It's very important that, as the defense raised, on that day they didn't see Hall key into his apartment. But later on, on March 4th of 2015, and this is on page 6 of the affidavit for the Candlewick apartment, Officer Hamm did observe the driver of the same car Hall was using. The court made an important observation, and that is on surveillance you are not going to have perfect knowledge of everything that happens as you're moving and traveling with individuals who are conceitedly trying to conceal their activity from law enforcement. That's one of the reasons they use changing phones, they use multiple locations, they use multiple dealers as they work in concert. Mr. Hall is driving from one place to another. He doesn't deal in the parking lot at his apartment complex in Candlewick. He drives to another parking lot at another apartment complex for a quick trade. And on that date, March 4th of 2015, Officer Hamm saw the driver of the same car. He could not say that it was Henry Hall on that date, but he saw that driver key into the 1203 apartment. That same Toyota Yaris is repeatedly asserted in the allegations of the affidavit as used by Mr. Hall. And Mr. Hall is seen doing deals later on and seen traveling from Candlewick to the Edwin apartment where Mr. Jenkins was eventually identified as the person coming out. Importantly for the other addresses, for Dragonfly, which was Mr. Hall's second residence, the 2015 residence, there was a deal that Mr. Hall conducted on April 6th where he left Dragonfly, went to the controlled purchase, came back to Dragonfly immediately afterward. In the light of all his extensive drug trafficking activity dating back to the previous year, that is clear probable cause for that address. The same thing is true for Edwin. The 520 Edwin address where Mr. Jenkins did a deal on April 6th of 2015, just the day before they applied for these warrants. Candlewick was Mr. Hall's address. Now he left that address as we understood from a communication from Mr. Hall in the allegations. This was given to the magistrate court. Mr. Hall left that address on Candlewick and went to Benton Harbor on April 2nd. But still his activity was ongoing up to that point. And it's important that Mr. Hall is communicating that Giovanni is going out of town, but I can handle you while you're gone. What's important here is that the organization and the conspiracy is ongoing. They're still serving their customers. They're still using the tools of their trade. And those tools can still be found. Evidence of those tools, there is good cause to believe, will be found in each one of these residences at the time that they're doing it, doing the investigation as a whole. Counsel, I apologize. I'd like to interrupt and ask you about a different issue in the case, about the search of a rental car that Mr. Jenkins is challenging. Is there anything in the record where Jenkins asserted he had a possessorial interest in the car? There is not, Your Honor. And I think that's very important because of this Court's jurisprudence on rental car situations and the Byrd case, which is before the Supreme Court now, which we note in our brief as well. The woman who rented the car, Carmise Langston, her name is on the rental information. She is the same woman who rented the 520 Edwin address where Mr. Jenkins, the activity that we were describing was ongoing. But Mr. Jenkins did not put any information on the record about his ability or his right to use that car. There was nothing in the contract that allowed for any other driver or particularly Mr. Jenkins. He didn't advance any of that information. Okay. Thank you. That aspect of the investigation is also important, Your Honor. I would say that there was good cause for that car, based upon the information that was found in Ms. Lee's apartment just before that. And they submitted, the investigators in August of 2015, submitted the search warrant the Court seen consistent with that car. There was clear consent from Ms. Lee, who did not know Mr. Jenkins, knew him by a nickname as introduced through Mr. Hall, but did not allow him into her home. There's clear that Mr. Jenkins did not preserve any right to his suitcase, which he left there, which was found in the home, and that's where another 118 grams of heroin was found, and Mr. Jenkins' state ID in immediate proximity to the budget rental car, to the car that the Court just mentioned. The defense also makes a direct mention of the fact that no informant, no police officer saw drugs within these apartments or contraband within these apartments. That has not been this Court's jurisprudence. What we are alleging in these search warrant affidavits, and what the investigator advanced, and I think the magistrate judge had good cause to approve, was that these locations were in direct nexus or in proximity to this ongoing activity over a course of time. The best indication of that is the one the Court pointed out with regard to the initial door drive address, the GPS information for the phone, which is the epicenter of not only investigation, but the trade that these individuals are engaging in. We didn't have the same GPS information in the subsequent warrants in 2015, but there's a great deal of surveillance which ties those locations to the individual defendant's activity that was ongoing up until the day before the application for the search warrants. Your Honors, if the Court has no further questions for the government at this time, I will rest on our brief and submission and thank the Court. Thank you. Okay. Briefly on the Candlewick search, unlike in Williams where the informant said that the person that they suspected stored narcotics and or other items in the home, there was none of that in this case. Second, the only identified possible suspect who was seen going in and out of the building, not in and out of the apartment, which is the privacy protected area, but in and out of the building was Hall. And at the time of the search, the people readily concede that Hall was no longer in Kalamazoo. We don't have any ties to anybody being in Candlewick who is a suspect in this case in any way at the time of the search. That's the bottom line. And I don't believe there was sufficient allegations to justify the admission of the evidence. Regarding the Ford Fusion, I readily concede that no evidence was presented at the hearing regarding his particular standing. However, there was evidence asserted in the affidavit tying Justin Jenkins to the rental car in multiple ways. That sufficiently, in my mind, showed a possessory interest. So for instance, if I'm driving somebody else's rental car, while it may be illegal for me to drive it, that doesn't mean that while I'm driving it, I don't have a privacy interest in it while I'm in the car. Bottom line, I'm in the car, I'm driving it on my own, I still have a privacy interest in it. Regardless, even if the car was stolen, you still have a privacy interest in the vehicle itself while you're driving it. You're saying a thief of a rental car could have a privacy interest in a rental car that they stole? I'll give you an example. What if he has a bag in the back of the car? And the police search that and then they go into the bag. What I'm saying is criminal activity doesn't waive privacy interests. They just don't. It's never been the case that because you've committed a crime, you've waived any and all privacy interests. I made an extreme example. I don't think I need to do that in this case because in the affidavit itself, it says that Justin Jenkins is associated with Carmise Langston. Carmise Langston is the one who rented it. She's one of his girlfriends. The key was found in the home that went to the car. There was supposed identification of Mr. Jenkins being the person who was in the home. That's clearly enough information that he was the one driving it, sufficient to justify a Fourth Amendment protected interest for purposes of the- Since your time is up, Mr. McCrae, if you could bring it to a conclusion very briefly. I don't believe there was probable cause in the affidavit for the fugitive. Thank you. I have only one point to make, Judge Larson. I don't think I was as detailed or thorough in distinguishing Williams, and I apologize for that. In Williams, the court found that these guns could be- the nature of the guns, the nature of the defendant's circumstance, et cetera, showed that they could only be held in two different locations, a car or a residence. They had to be-the court determined it had to be one place or the other, and I just don't think that's the same for, again, a street-level amount because of size, because of the-I mean, weapons, storing weapons are different than, I think, these small amounts. With that, unless there are questions, thank you very much. We appreciate the arguments all of you have given, and we'll consider the case carefully. Mr. Marcoux and Mr. Graham, I note that you are both court-appointed counsel. We appreciate very much for having accepted the appointments in this case and appreciate the careful advocacy you've shown on behalf of the defendants. Thank you.